UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                                Case No. 20-CR-196-5 (BHL)

JONATHAN HENLEY,

        Defendant.

---

## PLEA AGREEMENT

---

1.      The United States of America, by its attorneys, Matthew D. Krueger, United States Attorney for the Eastern District of Wisconsin, Stephen Ingraham, Assistant United States Attorney, Daniel Kahn, Acting Chief, Fraud Section, Department of Justice, Laura Connelly, Trial Attorney, Leslie S. Garthwaite, Trial Attorneys, and the defendant, Jonathan Henley, individually and by attorney Joan Hill McClain, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### Charges

2.      The defendant has been charged in a fourteen-count Indictment, which alleges that the defendant committed one count of bank fraud, in violation of Title 18, United States Code, Section 1344.

3.      The defendant has read and fully understands the charges contained in the Indictment. He fully understands the nature and elements of the crimes with which he has been charged, and the charges and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4.      The defendant voluntarily agrees to plead guilty to Count Six of the Indictment, attached hereto as Attachment A.

5.      The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the charge in Count Six of the Indictment.  The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the facts in Attachment B beyond a reasonable doubt.  The defendant admits that these facts are true and correct, and establish his guilt beyond a reasonable doubt.

6.      This information is provided for the purpose of setting forth a factual basis for the plea of guilty.  It is not a full recitation of the defendant's knowledge of, or participation in this offense.

## Penalties

7.      The parties understand and agree that the offense to which the defendant will enter a plea of guilty carries the following maximum term of imprisonment and fine:  thirty (30) years and $1,000,000.  The count also carries a mandatory special assessment of $100 and a maximum of five (5) years of supervised release.  The parties further recognize that a restitution order may be entered by the court.  The parties' acknowledgments, understandings, and agreements with regard to restitution are set forth in paragraphs 28 and 29 of this agreement.

8.      The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## Elements

9.      The parties understand and agree that in order to sustain the charge of bank fraud as set forth in Count Six of the Indictment, the government must prove each of the following propositions beyond a reasonable doubt:

First, that there was a scheme to obtain moneys, funds, credits, assets, securities, or other

2

property that was owned by or in the care, custody, or control of a bank or financial institution by means of false or fraudulent pretenses, representations or promises, as charged in the indictment; and

Second, that the defendant knowingly carried out and attempted to carry out the scheme; and

Third, that the defendant acted with the intent to defraud; and

Fourth, that the scheme involved a materially false or fraudulent pretense, representation, or promise, and

Fifth, at the time of the charged offense the deposits of the bank or other financial institution were insured by the Federal Deposit Insurance Corporation.

## Sentencing Provisions

10.     The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

11.     The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

12.     The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions, which they believe to be applicable to the offense set forth Attachment A. The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

13.     The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history.  The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history.  The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the

3

defendant's criminal history.

## Sentencing Guidelines Calculations

14.     The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

15.     The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which the defendant is pleading guilty.

## Base Offense Level

16.     The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in Count Six of the Indictment is seven (7) under Sentencing Guidelines Manual § 2B1.1(a)(1).

## Specific Offense Characteristics

17.     The parties further agree that a 10-level increase for a loss exceeding $150,000 under Sentencing Guidelines Manual § 2B1.1(b)(1)(F) is applicable to the offense level for the offense charged in Count Six of the Indictment.

18.     The parties further agree that a 2-level increase for an offense involving sophisticated means under Sentencing Guidelines Manual § 2B1.1(b)(10) is applicable to the offense level for the offense charged in Count Six of the Indictment.

4

## Acceptance of Responsibility

19.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility.  In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

## Sentencing Recommendations

20.     Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

21.     Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

22.     The government agrees to recommend a sentence within the applicable sentencing guideline range, as determined by the court.

## Court's Determinations at Sentencing

23.     The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement.  The United States Probation Office will make its own recommendations to the sentencing court.  The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 7 above.  The parties further understand that the sentencing court

5

will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

24. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## Financial Matters

25. The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule. The defendant agrees not to request any delay or stay in payment of any and all financial obligations. If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

26. The defendant agrees to provide to the Financial Litigation Unit (FLU) of the United States Attorney's Office, at least 45 days before sentencing, and also upon request of the FLU during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLU and any documentation required by the form. The defendant further agrees, upon request of FLU, whether made before or after sentencing, to promptly: cooperate in the identification of assets in which the defendant has an interest and cooperate in the liquidation of any such assets.

## Special Assessment

27. The defendant agrees to pay the special assessment in the amount of $100 prior to or at the time of sentencing.

6

## Restitution

28.     The parties acknowledge and understand that the government will recommend to the sentencing court that restitution be ordered and that it be apportioned among co-schemers to reflect the level of contribution to the victim's loss and economic circumstances of each conspirator pursuant to Title 18, United States Code, Section 3664(h).  The defendant understands that because restitution for the offense is mandatory, the amount of restitution shall be imposed by the court regardless of the defendant's financial resources.

29.     The defendant agrees to pay restitution as ordered by the sentencing court.  The defendant agrees to cooperate in efforts to collect any restitution obligation.  The defendant understands that imposition or payment of restitution will not restrict or preclude the filing of any civil suit or administrative action.

## Forfeiture

30.     The defendant understands that by pleading guilty, he will subject to forfeiture to the United States all right, title, and interest that he has in any property constituting or derived from proceeds obtained from the offense.

31.     The defendant acknowledges that as part of his sentence, the Court will decide, by a preponderance of the evidence, whether the government has established the requisite nexus between the offense and any specific property alleged to be subject to forfeiture and the amount of a personal money judgment he must pay.

## Defendant's Cooperation

32.     The defendant, by entering into this agreement, further agrees to fully and completely cooperate with the government in its investigation of this and related matters, and to testify truthfully and completely before the grand jury and at any subsequent trials or proceedings, if asked to do so.  The government agrees to advise the sentencing judge of the

7

nature and extent of the defendant's cooperation. The parties acknowledge, understand and agree that if the defendant provides substantial assistance to the government in the investigation or prosecution of others, the government, in its discretion, may recommend a downward departure from the applicable sentencing guideline range. The defendant acknowledges and understands that the court will make its own determination regarding the appropriateness and extent to which such cooperation should affect the sentence.

## Defendant's Waiver of Rights

33.     In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

a.     If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

b.     If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

c.     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of

8

defendant's guilt beyond a reasonable doubt.

        d.      At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

        e.      At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

       34.      The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

       35.      The defendant acknowledges and understands that he will be adjudicated guilty of the offense to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

       36.      The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth

9

Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

37.    The defendant knowingly and voluntarily waives any claim or objection he may have based on statute of limitations.

38.    The defendant knowingly and voluntarily waives his right to appeal his sentence in this case and further waives his right to challenge his conviction or sentence in any post-conviction proceeding, including but not limited to a motion pursuant to 28 U.S.C. Section 2255. This waiver does not extend to an appeal or post-conviction motion based on (1) any punishment in excess of the statutory maximum, (2) the sentencing court's reliance on any constitutionally impermissible factor, and (3) ineffective assistance of counsel.

## Further Civil or Administrative Action

39.    The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

## General Matters

40.    The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

41.    The parties acknowledge, understand, and agree that this plea agreement will be

10

filed and become part of the public record in this case.

42.     The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

43.     The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## Effect of Defendant's Breach of Plea Agreement

44.     The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## Voluntariness of Defendant's Plea

45.     The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and

11

agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 12/14/20

JONATHAN HENLEY
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 12/14/2

JOAN HILL MCCLAIN
Attorney for Defendant

For the United States of America:

Date: 12/16/2021

Leslie S. Garthwaite
LAURA CONNELLY
LESLIE S. GARTHWAITE
Trial Attorneys
U.S. Department of Justice
Criminal Division, Fraud Section

MATTHEW KRUEGER
United States Attorney
Eastern District of Wisconsin

STEPHEN INGRAHAM
Assistant United States Attorney

13

**Attachment A**

UNITED STATES OF AMERICA,

Plaintiff,

v.

THOMAS E. SMITH,
STEPHEN E. SMITH,
SAMUEL A. DAVIS,
ROBERT HAMILTON, and
JONATHAN E. HENLEY,

Defendants.

2020 OCT 20 P 4: 25

CLERK OF COURT

SEALED **20-CR-196**

Case No. 20-CR-
[18 U.S.C. §§ 1344, 1957, and 2]

---

**INDICTMENT**

---

THE GRAND JURY CHARGES THAT:

### BACKGROUND

At all times material to this Indictment:

#### *The Defendants and Relevant Entities*

1.      THOMAS E. SMITH was a resident of Pewaukee, Wisconsin, and the registered agent of T & T Holdings LLC ("T&T Holdings"), a Wisconsin limited liability company. T&T Holdings was administratively dissolved on or about March 20, 2017.

2.      STEPHEN E. SMITH was a resident of Milwaukee, Wisconsin, and the registered agent of CFA Auto Transport LLC ("CFA"), a Wisconsin limited liability company, and Complete Fundamentals, Inc. ("Complete Fundamentals"), a Wisconsin non-stock corporation. S. SMITH was also the organizer of New Beginnings Family Services LLC ("New Beginnings"), a Wisconsin limited liability company.

3. SAMUEL A. DAVIS was a resident of Chicago, Illinois, and the registered agent and president of Davis Development Group Inc. ("Davis Development"), an Illinois corporation.

4. ROBERT HAMILTON was a resident of Milwaukee, Wisconsin, and the president and registered agent of Glory Transportation Services, LLC ("Glory Transportation"), a Wisconsin limited liability company.

5. JONATHAN E. HENLEY was a resident of Chicago, Illinois, and the manager and one of the registered agents of Premier Logistic Solutions LLC ("Premier Logistic"), an Illinois limited liability company.

6. Individual 1 was a resident of Milwaukee, Wisconsin, and the registered agent of Rebels Paris, LLC ("Rebels"), a Wisconsin limited liability company.

7. Individual 2 was a resident of Milwaukee, Wisconsin, and the registered agent of Comfort Care Transit LLC ("Comfort Care"), a Wisconsin limited liability company.

8. Individual 3 was a resident of Milwaukee, Wisconsin. On or about May 21, 2020, Individual 3 filed paperwork with the State of Wisconsin establishing himself as the registered agent of New Beginnings.

### *The Small Business Administration*

9. The United States Small Business Administration ("SBA") was an executive branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

10. As part of this effort, the SBA enabled and provided for loans through banks, credit unions, and other lenders. These loans had government-backed guarantees.

2

*The Paycheck Protection Program*

11.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic.

12.     One source of relief that the CARES Act provided was the authorization of up to $349 billion in forgivable loans to small businesses for payroll, mortgage interest, rent/lease, and utilities, through a program referred to as the Paycheck Protection Program ("PPP"). In April 2020, Congress authorized up to $310 billion in additional PPP funding.

13.     The PPP allowed qualifying small businesses and other organizations to receive PPP loans. Businesses were required to use PPP loan proceeds on payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period of time and used a certain percentage of the PPP loan proceeds on payroll expenses.

14.     The amount of a PPP loan that a small business was entitled to receive was determined by the number of employees employed by the business and the business's average monthly payroll costs.

15.     In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) had to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business was

3

eligible to receive under the PPP. In addition, businesses applying for a PPP loan had to provide documentation showing their payroll expenses.

16. The SBA oversaw the PPP. However, individual PPP loans were issued by private, approved lenders who received and processed PPP applications and supporting documentation, and then made loans using the lenders' own funds, which were 100% guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

### *Relevant Financial Institutions*

17. Financial Institution 1 was a federally insured financial institution and member of the Federal Home Loan Bank System headquartered in Green Bay, Wisconsin. Financial Institution 1 was an approved SBA lender and participated as a PPP lender to small businesses.

18. Financial Institution 2 was a Federal Deposit Insurance Corporation-insured bank headquartered in Minneapolis, Minnesota.

19. Credit Union 1 was a nationally insured credit union headquartered in Racine, Wisconsin.

### COUNTS ONE THROUGH SIX
*Bank Fraud* – 18 U.S.C. § 1344 and § 2

20. The Grand Jury re-alleges and incorporates by reference the factual allegations contained in paragraphs 1 through 19 of this Indictment as if fully set forth herein.

### *The Scheme to Defraud*

21. From in or about April 2020 through in or about July 2020, in the State and Eastern District of Wisconsin and elsewhere,

4

THOMAS E. SMITH,
STEPHEN E. SMITH,
SAMUEL A. DAVIS,
ROBERT HAMILTON, and
JONATHAN E. HENLEY,

and others known and unknown to the Grand Jury, and aided and abetted by each other, did knowingly execute and attempt to execute a scheme and artifice to defraud Financial Institution 1, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, and by omission of material facts, certain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of Financial Institution 1.

### The Purpose of the Scheme and Artifice

22.     It was the purpose of the scheme for defendants T. SMITH, S. SMITH, DAVIS, HAMILTON, and HENLEY, and others known and unknown to the Grand Jury, to unlawfully enrich themselves by: (a) submitting false and fraudulent PPP loan applications to financial institutions falsely representing that the applicant entities were functional and operational businesses and falsely promising to use the fund proceeds on covered business expenses, and (b) concealing and causing the concealment of these false and fraudulent applications.

### Manner and Means of the Scheme

23.     It was part of the scheme that defendants T. SMITH, S. SMITH, DAVIS, HAMILTON, HENLEY, Individual 1, Individual 2, Individual 3, and others, submitted and caused to be submitted fraudulent PPP loan applications to Financial Institution 1 for the purpose of obtaining funds from Financial Institution 1.

24.     It was further part of the scheme that each of the PPP loan applications falsely claimed that the PPP loan applicant company was in operation as of February 15, 2020, when in fact it was not, and that it employed individuals for whom it paid salaries and payroll taxes, or paid independent contractors (as reported on IRS Form 1099-MISC).    In fact, CFA, Davis

5

Development, New Beginnings, Comfort Care, and Premier Logistic were not in operation in February 2020. Specifically:

a. CFA's loan application falsely claimed that it was operational as of February 15, 2020, when in fact it was not and went into "delinquent" status with the Wisconsin Department of Financial Institutions ("WDFI") on or about July 1, 2019. CFA's application did not report that S. SMITH restored the active status of CFA with WDFI on or about May 5, 2020.

b. Davis Development's loan application falsely claimed that it was operational as of February 15, 2020, when in fact Davis Development had been administratively dissolved with the Illinois Secretary of State ("ILSOS") as of on or about August 10, 2018. Davis Development's application did not report that DAVIS reinstated the company on or about May 2, 2020.

c. New Beginnings' loan application falsely claimed that it was operational as of February 15, 2020, when in fact New Beginnings had been administratively dissolved with WDFI as of on or about April 13, 2020. New Beginnings' application did not report that S. SMITH reinstated the company on or about May 1, 2020.

d. Comfort Care's loan application falsely claimed that it was operational as of February 15, 2020, when in fact Comfort Care was administratively dissolved with WDFI on June 13, 2017. Comfort Care's application did not report that Individual 2 restored the active status of Comfort Care with WDFI on or about May 12, 2020.

e. Premier Logistic's loan application falsely claimed that it was operational as of February 15, 2020, when in fact Premier Logistic had been administratively dissolved with the ILSOS as of on or about June 14, 2019. Premier Logistic's application did not report that HENLEY reinstated the company on or about May 14, 2020.

25. It was further part of the scheme that each of the PPP loan applications falsely certified that the PPP loan applicant company employed individuals for whom it paid salaries and

payroll taxes, or paid independent contractors (as reported on IRS Form 1099-MISC) and falsely represented the number of employees each company employed. Each of the PPP loan applications also included falsified Employer's Quarterly Federal Tax Returns (IRS Forms 941) for each quarter of 2019 and the first quarter of 2020. In fact, none of the businesses had filed Forms 941 in any quarter of 2019 or the first quarter of 2020, meaning that the company had no employees for which federal taxes were paid during that period. Specifically:

      a. CFA's loan application falsely claimed that its average monthly payroll was $97,000 and that it employed 38 people.

      b. Comfort Care's loan application falsely claimed that its average monthly payroll was $92,000 and that it employed 23 people.

      c. Davis Development's loan application falsely claimed that its average monthly payroll was $71,000 and that it employed 20 people.

      d. New Beginnings' loan application falsely claimed that its average monthly payroll was $92,000 and that it employed 28 people.

      e. Premier Logistic's loan application falsely claimed that its average monthly payroll was $85,000 and that it employed 23 people.

      f. Rebels' loan application falsely claimed that Rebels' average monthly payroll was $62,000 and that it employed 17 people.

      g. Glory Transportation's loan application falsely claimed that Glory Transportation's average monthly payroll was $62,000 and that it employed 14 people.

    26. It was further part of the scheme that defendants T. SMITH, S. SMITH, DAVIS, HAMILTON, HENLEY, Individual 1, Individual 2, Individual 3, and others falsely represented the intended use of the funds, claiming that the funds would be used for legitimate business expenses. Specifically, CFA, Comfort Care, Davis Development, New Beginnings, Premier

Logistic, and Rebels' loan applications each falsely claimed that it intended to spend loan proceeds on payroll, lease or mortgage expenses, interest, and utilities. In fact, the loan funds were used for, among other things, personal expenses and other non-business expenses.

27. It was further part of the scheme that defendants T. SMITH, S. SMITH, DAVIS, HENLEY, Individual 1, Individual 2, Individual 3, and others opened or directed others to open bank accounts at Financial Institution 1 to facilitate and expedite obtaining PPP loan funds, including:

      a.  On or about May 5, 2020, S. SMITH opened bank account No. x8659 at Financial Institution 1 in the name of CFA.

      b.  On or about May 5, 2020, DAVIS opened bank account No. x8733 at Financial Institution 1 in the name of Davis Development.

      c.  On or about May 8, 2020, Individual 1 opened bank account No. x9383 at Financial Institution 1 in the name of Rebels.

      d.  On or about May 13, 2020, Individual 2 opened bank account No. x2840 at Financial Institution 1 in the name of Comfort Care.

      e.  On or about May 19, 2020, HENLEY opened bank account No. x7764 at Financial Institution 1 in the name of Premier Logistic.

      f.  On or about May 22, 2020, Individual 3 opened bank account No. x6862 at Financial Institution 1 in the name of New Beginnings.

28. It was further part of the scheme that after the PPP loans were deposited into the applicant company's bank account at Financial Institution 1, defendants T. SMITH, S. SMITH, DAVIS, HAMILTON, Individual 1, Individual 2, and Individual 3 transferred or directed the transfer of the loan proceeds to each other, and to entities controlled by one of the defendants, enabling them to enrich themselves from the loan proceeds.

8

29. It was further part of the scheme that when defendants T. SMITH, S. SMITH, DAVIS, HAMILTON, HENLEY, Individual 1, Individual 2, and Individual 3 learned that Financial Institution 1 froze or inquired about their loan applications, that Defendants, Individual 1, Individual 2, and Individual 3 took steps to misrepresent, conceal, hide and cause to be misrepresented, concealed, and hidden, the existence, purpose, and acts done in furtherance of the scheme.

30. It was further part of the scheme that in total, at least approximately $960,000 was provided to Defendants, Individual 1, Individual 2, and Individual 3 in fraudulently obtained loan proceeds, and an additional $442,500 was attempted to be fraudulently obtained by Defendants, Individual 1, Individual 2, and Individual 3.

*Executions*

31. On or about the following dates, in the State and Eastern District of Wisconsin and elsewhere, Defendants T. SMITH, S. SMITH, DAVIS, HAMILTON, and HENLEY, aided and abetted by each other and by others known and unknown to the Grand Jury, did knowingly execute and attempt to execute the above-described scheme to defraud by committing and willfully causing others to commit the following acts, each of which constituted an execution of the fraudulent scheme:

| Count | Defendant(s) | Approximate Date | ACT | Approximate Amount Sought in Loan |
|---|---|---|---|---|
| 1 | T. SMITH DAVIS | April 26, 2020 | Submission of fraudulent PPP loan application for Davis Development to Financial Institution 1 | $177,500 |
| 2 | T. SMITH S.SMITH | May 1, 2020 | Submission of fraudulent PPP loan application for CFA to Financial Institution 1 | $242,500 |
| 3 | T. SMITH HAMILTON | May 1, 2020 | Submission of fraudulent PPP loan application for Glory Transportation to Financial Institution 1 | $155,000 |

9

| Count | Defendant(s) | Approximate Date | Act | Approximate Amount Sought in Loan |
|-------|-------------|------------------|-----|-----------------------------------|
| 4 | T. SMITH<br>S. SMITH | May 8, 2020 | Submission of fraudulent PPP loan application for Rebels to Financial Institution 1 | $155,000 |
| 5 | T. SMITH | May 15, 2020 | Submission of fraudulent PPP loan application for Comfort Care to Financial Institution 1 | $230,000 |
| 6 | T. SMITH<br>HENLEY | May 20, 2020 | Submission of fraudulent PPP loan application for Premier Logistic to Financial Institution 1 | $212,500 |

Each in violation of Title 18, United States Code, Sections 1344(2) and 2.

## COUNTS SEVEN THROUGH FOURTEEN
*Money Laundering – 18 U.S.C. § 1957*

32.    The Grand Jury re-alleges and incorporates by reference the factual allegations contained in paragraphs 1 through 31 of this Indictment as if fully set forth herein.

33.    On the dates specified below, in the State and Eastern District of Wisconsin and elsewhere, Defendants T. SMITH, S.SMITH, DAVIS, and HAMILTON, aided and abetted by each other and by others known and unknown to the Grand Jury, knowingly engaged in, attempted to engage in, and caused others to engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, knowing that such transaction involved criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, bank fraud, in violation of Title 18, United States Code, Section 1344:

| Count | Defendant(s) | Approximate Date | Description of Transaction |
|-------|--------------|------------------|----------------------------|
| 7 | HAMILTON | May 6, 2020 | Cashier's check for approximately $30,000 withdrawn from Glory Transportation's Financial Institution 1 account No. x2240, written to T. SMITH. |
| 8 | HAMILTON | May 8, 2020 | Cashier's check for approximately $50,000 withdrawn from Glory Transportation's Financial Institution 1 account No. x2240, deposited into Credit Union 1 account No. x2707, held in the name of HAMILTON. |
| 9 | T. SMITH | May 18, 2020 | Cashier's check for approximately $20,000 withdrawn from Rebels' Financial Institution 1 account No. x9383, deposited into Financial Institution 1 account ending in 1719, held in the name of T&T Holdings. |
| 10 | S. SMITH | May 18, 2020 | Cashier's check for approximately $20,000 withdrawn from Rebels' account No. x9383, deposited into Financial Institution 2 account No. x4088, held in the name of S. SMITH d/b/a Complete Fundamentals. |

11

| Count | Defendant(s) | Approximate Date | Description of Transaction |
|-------|-------------|------------------|----------------------------|
| 11 | T. SMITH | May 20, 2020 | Cashier's check for approximately $40,000 withdrawn from Comfort Care's Financial Institution 1 account No. x2840, deposited into Financial Institution 1 account No. x4241, held in the name of T. SMITH. |
| 12 | T. SMITH DAVIS | May 21, 2020 | Cashier's check for approximately $75,000 withdrawn from Davis Development's Financial Institution 1 account No. x8733, deposited into Financial Institution 1 account No. x1719, held in the name of T&T Holdings. |
| 13 | T. SMITH S. SMITH | May 22, 2020 | Cashier's check for approximately $25,000 withdrawn from CFA's Financial Institution 1 account No. x8659, deposited into Financial Institution 1 account No. x1719, held in the name of T&T Holdings. |
| 14 | S. SMITH | May 22, 2020 | Cashier's check for approximately $25,000 withdrawn from CFA's Financial Institution 1 account No. x8659, deposited into Financial Institution 2 account No. x4088, held in the name of S. SMITH d/b/a Complete Fundamentals. |

Each in violation of Title 18, United States Code, Section 1957 and Section 2.

12

## FORFEITURE ALLEGATIONS

The allegations contained in Counts 1-14 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture. Upon conviction of an offense alleged in Counts 1-14, Defendants shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), by way of Title 28, United States Code, Section 2461(c), any property that constitutes or is traceable to proceeds of the offense. This property includes, but is not limited to, a sum of money reflecting the proceeds Defendants obtained from the offense.

The allegations contained in Counts 1-14 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture. Upon conviction of an offense alleged in Counts 1-14, Defendants shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any property involved in the offense, or any property traceable to such property. This property includes, but is not limited to, a sum of money reflecting the proceeds Defendants obtained from the offense.

If any of the above-described forfeitable property, as a result of any act or omission of the Defendants,

      a. cannot be located upon the exercise of due diligence;

      b. has been transferred or sold to, or deposited with, a third party;

      c. has been placed beyond the jurisdiction of the Court;

      d. has been substantially diminished in value; or

      e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code, Section 2461(c), to seek the forfeiture of any other property of the

13

Defendants, up to the value of the above-described forfeitable property.

A TRUE BILL:

███████████████████████

FOREPERSON /

Dated:  10-20-2020

MATTHEW D. KRUEGER
United States Attorney

DANIEL KAHN
Acting Chief, U.S. Department of Justice, Fraud Section

14

**Attachment B**

The defendant admits that these facts are true and correct and establish his guilt beyond a reasonable doubt:

*The Paycheck Protection Program*

1.       The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic.  One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").  In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

2.       In order to obtain a PPP loan, a qualifying business must submit a PPP loan application, which is signed by an authorized representative of the business.  The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications, including that the business was in operation on February 15, 2020, in order to be eligible to obtain the PPP loan.  In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees.  These figures are used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

3.       A PPP loan application must be processed by a participating financial institution (the lender).  If a PPP loan application is approved, the participating financial institution funds the PPP loan using its own monies, which are 100% guaranteed by Small Business Administration (SBA).  Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan.

4.       PPP loan proceeds must be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities.  The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time after receiving the proceeds and uses a certain amount of the PPP loan proceeds on payroll expenses.

5.       The PPP is overseen by the SBA, which is headquartered at 409 3rd Street SW, Washington, D.C. 20416, and has authority over all loans. Individual PPP loans, however, are issued by private approved lenders (most commonly, banks and credit unions), which receive and process PPP applications and supporting documentation, and then make loans using the lenders' own funds.

6.       Bank 1 is an SBA-approved lender headquartered in Green Bay, Wisconsin. At the time of the charged offense, the deposits of Bank 1 were insured by the Federal Deposit

15

Insurance Corporation.

7.     Bank 2 is an SBA-approved lender headquartered in Chicago, Illinois. At the time of the charged offense, the deposits of Bank 2 were insured by the Federal Deposit Insurance Corporation.

*Participants in the Schemes*

8.     The defendant was a citizen of the United States and resident of Chicago, Illinois.

9.     The defendant was the manager and one of the registered agents of Premier Logistic Solutions LLC ("Premier Logistic"), a trucking company based in Chicago. Premier Logistic was an Illinois limited liability company, which was formed on or about January 17, 2018. Premier Logistic was administratively dissolved on or about June 14, 2019. On or about May 14, 2020, Premier Logistic filed an Application for Reinstatement Following Administrative Dissolution or Revocation. As of February 15, 2020, Premier Logistic did not have any employees for whom it paid salaries or payroll taxes, or independent contractors as reported on an IRS Form 1099-MISC.

10.     Co-Conspirator 1 ("CC-1") was a citizen of the United States and resident of Milwaukee, Wisconsin.

11.     Co-Conspirator 6 ("CC-6") was the owner and registered agent of Davis Development Group, Inc. ("Davis Development"), an Illinois corporation based in Chicago, Illinois.

12.     Individual 1 was a resident of Chicago, Illinois.

13.     Individual 2 was a resident of The Bronx, New York.

14.     Individual 3 was a resident of Chicago, Illinois.

*The Fraudulent PPP Loan Application to Bank 1*

15.     In or around May 2020, CC-6 introduced the defendant to CC-1 to facilitate getting a PPP loan for Premier Logistic. The defendant provided CC-1 with certain information about Premier Logistic, including the company's address and tax identification number. In or around May 2020, defendant and CC-6 drove to Wisconsin to meet with CC-1 and obtained a completed Premier Logistic PPP loan application. The defendant knew that the application contained false information about Premier Logistic, including the false statement about its operational status and employees. CC-1 directed the defendant to sign it, which he did. CC-1 also told the defendant where to drop off the application.

16.     In connection with the effort to obtain the loan, CC-1 directed the defendant to open a business checking account for Premier Logistic at Bank 1. The defendant did so on or about May 19, 2020, funding the account with a $100 deposit. The defendant was the sole authorized signatory on the account. On or about May 19, 2020, the defendant signed a

16

depository declaration on behalf of Premier Logistic with Bank 1.

17.     On or about May 20, 2020, the defendant physically dropped off the fraudulent PPP loan application for Premier Logistic at a branch of Bank 1 in Wisconsin.

18.     When the defendant first agreed to apply for a fraudulent loan with CC-1, they agreed to seek a $100,000 loan for Premier Logistic. From that, the defendant agreed to pay CC-1 $20,000 of the loan funds. When the defendant and CC-1 met in person and CC-1 gave the defendant the loan paperwork, the amount of the loan was increased to $212,500. The defendant agreed to pay CC-1 $112,500 from this new loan amount.

19.     The PPP loan application package for Premier Logistic that the defendant submitted to Bank 1 requested a $212,500 PPP loan for Premier Logistic. Included with the loan application package were (1) an SBA Form 2483 PPP Borrower Application Form; and (2) five IRS Forms 941 (Employer's Quarterly Federal Tax Returns) purportedly reflecting Premier Logistic's payroll data from January 2019 to March 2020 The Premier Logistic PPP application submitted to Bank 1 falsely stated that Premier Logistic's average monthly payroll was $85,000 and that the company had 23 employees.

20.     The SBA Form 2483 falsely certified that Premier Logistic was "in operation on February 15, 2020, and had employees for whom it paid salaries and payroll taxes or paid independent contractors as reported on Form(s) 1099-MISC." The form further falsely certified that the PPP loan funds would be "used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule." The form also acknowledged that failure to use the PPP funds in accordance with the requirements of the PPP program, and making false statements in support of the loan application, could result in criminal penalties.

21.     The IRS Forms 941 that were included with the PPP loan application falsely represented, among other things, that Premier Logistic had 23 employees. The purported Form 941 for the first quarter of 2020, falsely represented that Premier Logistic had paid $255,789.45 in wages, tips, and other compensation to its 23 employees. In fact, Premier Logistic made no quarterly tax filings in 2019 or in the first quarter of 2020.

22.     Ultimately, Bank 1 did not approve the Premier Logistic PPP loan.

***The Fraudulent PPP Loan Application to Bank 2***

23.     In or around June 2020, the defendant told Individual 1 that Bank 1 denied his PPP loan application for Premier Logistic. Individual 1 offered to connect the defendant with someone who would help him submit another PPP loan application to Bank 2. The defendant provided Individual 1 with the Premier Logistic business information, including the address and EIN.

24.     Individual 1 told the defendant that tax records were required as part of the loan application. Individual 1 agreed to arrange to have someone prepare false tax records for the defendant. Specifically, Individual 1 introduced the defendant to Individual 2, who represented

17

him/herself to be an accountant. Individual 2 then created a fake IRS Form 1040 (U.S. Individual Income Tax Return) for the year 2019 in the defendant's name and an IRS Schedule C (Form 1040 or 1040-SR) documenting Profit or Loss from Business (Sole Proprietorship) for the year 2019 in the name of Premier Logistic. The defendant knew these were false tax records as he had not submitted the IRS Form 1040 or the Schedule C to the IRS, and the information about his income and the income and expenses of Premier Logistic contained on the form was false. The defendant knew that the fake tax documents would be submitted to Bank 2 in order to obtain a PPP loan.

25.     The defendant then caused a second SBA Form 2483 for Premier Logistic[1] to be submitted to Bank 2 seeking $17,500 in PPP funds This PPP application falsely stated that Premier Logistic's average monthly payroll was $7,000 and that the company had two employees.

26.     The defendant agreed to pay a third party $1,000 after the loan was funded as a "cut" for helping the defendant to obtain the loan. Bank 2 did not approve the loan request and did not fund the loan.

### The Fraudulent Economic Injury Disaster Relief Program Loan Applications

27.     The Economic Injury Disaster Loan ("EIDL") program was an SBA program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

28.     The CARES Act authorized the SBA to provide EIDLs of up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic. In addition, the CARES Act authorized the SBA to issue advances of up to $10,000 to small businesses within three days of applying for an EIDL. The amount of the advance was determined by the number of employees the applicant certified having. The advances did not have to be repaid.

29.     In order to obtain an EIDL and advance, a qualifying business had to submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. In the case of EIDLs for COVID-19 relief, the 12-month period was that preceding January 31, 2020. The applicant also had to certify that all of the information in the application was true and correct to the best of the applicant's knowledge.

30.     EIDL applications were submitted directly to the SBA. The amount of the loan, if the application was approved, was determined based, in part, on the information provided by the applicant about employment, revenue, and cost of goods, as described above. Any funds issued under an EIDL or advance were issued directly by the SBA. EIDL funds could be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments. If the applicant also obtained a loan under the PPP, the EIDL funds could

---

[1] The application was mistakenly submitted in the name "Premier Logistics Solutions."

18

not be used for the same purpose as the PPP funds.

31. The defendant was involved in the submission of two EIDL applications that contained information he knew to be false:

      a. On or about April 7, 2020, the defendant submitted an EIDL application in the name of Premier Logistic. The application falsely claimed that Premier Logistic had $360,000 in gross revenues from January 31, 2019 through January 31, 2020. It also falsely claimed that Premier Logistic had four employees. On or about May 4, 2020, the defendant received a $4,000 SBA EIDL advance.

      b. On or about June 22, 2020, Individual 3, using information provided by the defendant, submitted an EIDL application falsely claiming that the defendant owned and operated a sole proprietorship in the name of "Johnathan Henley." The application falsely claimed that the sole proprietorship had $99,200 in gross revenues from January 31, 2019 through January 31, 2020. It also falsely claimed that the sole proprietorship had 10 employees. The SBA denied the application as duplicative of the EIDL application for Premier Logistic.

***Statement to Law Enforcement***

32. The defendant was interviewed by federal law enforcement agents on or about July 7, 2020 and told the agents that Premier Logistic did not and had never had 23 employees, as was stated in the PPP application. He falsely stated that he and CC-1 did not have an agreement about how much the defendant would pay CC-1 once the Bank 1 PPP loan was funded.